UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

EUGENE BEVACQUA,

               Plaintiff,

       v.

UNION PACIFIC RAILWAY
COMPANY, a Delaware
corporation.,

               Defendant.

NO. CV-05-0321-EFS

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ENTERING JUDGMENT IN DEFENDANT'S FAVOR, AND CLOSING FILE**

A motion hearing was held in the above-captioned matter on October 4, 2006. Barareh Samanian appeared on behalf of Plaintiff Eugene Bevacqua, and William Schroeder appeared on behalf of Defendant Union Pacific Railway Co. ("Union Pacific"). Before the Court was Defendant's Motion for Summary Judgment (Ct. Rec. 18). After reviewing the submitted materials and relevant authority and hearing oral argument, the Court was fully informed. This Orders serves to memorialize and supplement the Court's ruling granting Defendant's motion, finding that preclusive effect is to be given to the Public Law Board's rule violation and discipline determinations and that Plaintiff failed to present sufficient evidence of pretext to survive summary judgment.

///

ORDER - 1

# I.  Undisputed Facts[1]

Plaintiff Eugene Bevacqua began employment with Union Pacific in 1973.  (Bevacqua Dep. at 12:1-15; *see also* Complaint: Ct. Rec. 1-1 ¶ 2.1.)  The instant suit arises out of Mr. Bevacqua transporting Railcar CFWR 76718 without a full braking system on October 20, 2004.

1.  <u>Railcar CFWR 76718</u>

In July 2004, Railcar CFWR 76718 was tagged as bad ordered[2] by Michael Rosgen after he noticed that the brake rigging on this railcar was hanging down and dragging. (Rosgen Dep. at 9:1-25, 10:1-25.) As a result of the discovery, the brake rigging was torn out, including the Number 3 and Number 4 brake beams, and the railcar was taken to the Ayer, Washington railyard.  *Id.* at 11:1-13.  Mr. Rosgen then reported the bad

---

[1]  In ruling on a motion for summary judgment, the Court considered the facts, including the parties' Undisputed Statement of Facts submission, and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (per curium).  The following factual recitation is created utilizing this standard.

[2]  The term "bad order" is an old railroad term that means equipment is broken, malfunctioning, or otherwise in some form of disrepair. (Harrison Dep. At 62:15-23.)  The purpose of "bad ordering" a railcar is to ensure that it is not moved until it is repaired and should likewise not be moved without the department's authorization. (Rosgen Dep. At 21:7-22.)

ORDER - 2

order status to the dispatcher, so that the car department could be notified and the railcar repaired. *Id.* at 11:24-25, 12:1-13.

In August 2004, Mr. Rosgen again encountered this railcar when he heard over the radio that the railcar was scheduled for pick up by the train crew ahead of him. (Rosgen Dep. at 15:4-6, 18-19.) Mr. Rosgen contacted Conductor Glenn Batty and told him that Railcar CFWR 76718 was a bad order. *Id.* at 15:12-15. Mr. Batty's engineer called the dispatcher and the crew was instructed to set Railcar CFWR 76718 out and not take it. (Batty Dep. at 17:9-25.)

Mr. Rosgen again came across this car on September 9 or 10, 2004, when both he and Charles Harrison, the Manager of Operating Practices for Eastern Washington as well as parts of Oregon, were in Ayer.[3] (Harrison Dep. at 31:16-25.) Mr. Rosgen informed Mr. Harrison that he had set out Railcar CFWR 76718 as a bad order because brake rigging had been removed. *Id.* at 32:12-16. After learning of the defective railcar, Mr. Harrison left a voicemail for Jim Digiovanni, the manager of mechanical maintenance, regarding the bad order status of the railcar. *Id.* at 32:17-24, 37:15-24. In addition to its bad order status, Mr. Harrison recognized Railcar CFWR 76718 as being on the Union Pacific "most wanted

---

[3] Before entering management at Union Pacific, Mr. Harrison was involved in Union-related activities, serving for two years as local chairman. (Harrison Dep. at 61:23-25, 62:1-13.) In that capacity, Mr. Harrison participated in formal investigations in which he defended the charged employee. *Id.*

ORDER - 3

1 car list."[4] (Dep. Harrison at 35:14-25.) In hopes of receiving the

2 award of a box of Omaha Steaks for reporting a car on the "most wanted

3 car list," Mr. Harrison also reported Railcar CFWR 76718 to the National

4 Customer Service Center. *Id.* at 35:7-17. Mr. Harrison testified that

5 the reason Railcar CFWR 76718 had not been repaired after Mr. Rosgen had

6 initially reported it bad ordered was due to a failure somewhere in the

7 reporting process; Mr. Hunt concurred with this conclusion. *Id.* at

8 64:18-25; Hunt Dep. at 60:23-61:6.

9  On the morning of September 20, 2004, Union Pacific Manager of Road

10 Operations Clifton Mallett, who was based out of Spokane, Washington,

11 returned to work following a vacation. (Mallett Dep. at 99:9-19, 121:5-

12 15.) Upon arriving at work, Mr. Mallett reviewed a report generated by

13 Union Pacific's office in St. Louis that indicated that a group of eight

14 or nine missing cars, including CFWR 76718, were located at Ayer,

15 Washington. *Id.* at 88:22-25, 89:11-6, 99:9-24. In response to this

16 information, Mr. Mallett asked Mr. Rosgen, who was already scheduled to

17 go through the Ayer railyard, to look for the nine cars and to leave him

18 a voicemail on their status. (Rosgen Dep. at 16:20-25, 17:1-19.) In

19 particular, Mr. Mallett requested Mr. Rosgen leave him a message if

20 Railcar CFWR 76718 was among the cars, and if it was still bad ordered.

21 (Mallett Dep. at 89: 20-25, 90:1-2, 91:5-24; Rosgen Dep. at 16: 20-25,

22 17:1-19.) Mr. Rosgen left a voice mail message for Mr. Mallett advising

23

24   [4] The "most wanted car list" is a list published in Union Pacific's

25 employee newsletter that identifies all "lost" cars on the Union Pacific

26 system.

ORDER - 4

that Railcar CFWR 76719 was still in bad order status; Mr. Mallett listened to this message at 10:00 or 11:00 p.m. on the evening of September 20, 2004.    Mr. Mallett stated he did not provide this information to Mr. Bevacqua because he believed Mr. Bevacqua would discover the obvious defect before picking up the car during his required air test and inspection.    (Mallett Dep. at 97:14-25, 98:1-25, 100:5-11, 107:16-23, 121:16-25, 122:1-9.)    Mr. Rosgen does not recall Mr. Mallett calling him back.    (Rosgen Dep. at 31:18-19.)

Earlier, between  4:00 and 5:00 p.m. on September 20, 2004, Mr. Bevacqua received his work order documents, which identified the cars his train was scheduled to pick up, from the National Customer Service Center in St. Louis.    He did not receive his orders from Mr. Mallett; however, Mr. Mallett was aware of Mr. Bevacqua's assigned task.    (Harrison Dep. at 69:21-25, 70:1-2; Mallett Dep. at 97:1-3, 126:12-23.)    The work order did not show Railcar CFWR 76718 as "bad ordered."    (Harrison Dep. at 55:5-20.)    As Mr. Bevacqua walked from the train to the depot to pick up a radio microphone in order to communicate with the dispatcher and other employees, he encountered Mr. Mallett who criticized him for delaying departure of the train and repeatedly said "get out of town." (Appeal Letter to Hunt.)    There was no mention by Mr. Mallett of the railcars listed on Mr. Bevacqua's work order, specifically Railcar CFWR 76718.    *Id.*    Mr. Harrison admitted that had the railcar been in the proper reporting status - that is, the current status of "bad ordered" -, it should have been left off of Mr. Bevacqua's work orders.    (Harrison Dep. at 55:12-15.)

Consistent with his work order documents, after leaving Spokane, Mr. Bevacqua stopped in Ayer to pick up rail cars, including Railcar CFWR 76718, before continuing to Hinkle, Oregon.  He arrived in Ayer at 11:55 p.m. the night of September 20, 2004, and remained there until 1:25 a.m. on the morning of September 21, 2004.  (Complaint ¶ 2.11.7.)  Prior to leaving Ayer, Mr. Bevacqua was required to perform an inspection and air test on each of the railcars.  (Bevacqua Dep. at 15:13-18, 17:13-15; Batty Dep. at 33:14-21; *see also* Union Pacific Air Brake/Train Handling Rules 30.10.1 & 30.10.2.)  Mr. Bevacqua spent about one and one half hours performing an air test of twenty-three cars, including Railcar CFWR 76718.  (Bevacqua Dep. at 21:9-12; Appeal Letter to Hunt.)  At that time, he believed that all the brakes were working because he observed piston travel.  *Id.* at 22:6-14.  When conducting an air test of Railcar CFWR 76718, Mr. Bevacqua walked around the car three times.  *Id.* at 23:12-14. Mr. Bevacqua did not detect that only one half of the brakes were working or that a brake beam was missing; if he had, he would not have moved the car.  *Id.* at 21:13-18, 22:15-16.

2.  <u>Disciplinary Proceedings</u>

Due to Mr. Bevacqua moving Railcar CFWR 76718, a disciplinary proceeding was instituted by Mr. Harrison.  Failure to conduct a proper air brake test and inspection in compliance with Union Pacific Rule 30.10 is a mandatory Level 4 rule violation.  (Union Pacific Railroad Policy for Ensuring Rules Compliance, Upgrade Discipline Policy p. 12.)  Mr. Harrrison knew that Mr. Bevacqua could potentially be terminated due to a 2002 Level 4 offense.  (Harrison Dep. at 48:13-17, 57:4-57:18.)

In 2002, as a result of that Level 4 offense, Mr. Bevacqua had faced a thirty-day suspension. (Bevacqua Dep. At 35:19-25, 26:1-20.) Instead of serving the suspension, Mr. Bevacqua exercised an option that one can take every eight years to attend a three-day "core training" class offered by Union Pacific in lieu of formal discipline. (Bevacqua Dep. at 37:5-8; Defendant's Exhibit 508.) As a condition of selecting this alternative discipline, Mr. Bevacqua could not incur another Level 4 offense within a twenty-four month period or would face termination. This twenty-four month period would have expired on September 24, 2004. (Bevacqua Dep. at 35:19-36:20.)

The investigation hearing regarding the September 21, 2004, incident was held on October 15, 2004. It was conducted by Union Pacific manager, M. H. Battle, and Mr. Bevacqua was represented by United Transportation Union (UTU) member L.D. McKillip. (Transcript, In Re the Investigation of Mr. E.F. Bevacqua, pp. 1, 6.) During the course of the hearing, Mr. Battle heard and considered testimony from witnesses called by each party. Mr. Rosgen, Conductor Batty, and Mr. Bevacqua provided testimony on behalf of Mr. Bevacqua, while Mr. Harrison and Mechanical Foreman Michael Mickelson provided testimony at the request of Union Pacific. Mr. Mallett was not present at the hearing and did not offer testimony because he was not called as a witness by either party. *Id.* pp. 2-3. Following the investigation hearing, Mr. Battle made, in pertinent part, the following findings:

> The following facts were made clear and were not refuted by the charged employee or his representative. 1) Mr. Bevacqua was the Conductor on Train MSKHK-20. 2) It was Mr. Bevacqua's responsibility to perform the inspection portion of the Air Test and Inspection per Rule 30.10.1 sec "B" and Rule 30.10.2 on cars picked up at Ayer, WA. 3) Mr. Bevacqua has received

in his words "SUBSTANTIAL" training on the requirements for an "On Line" pick-up Air Brake Test And Inspection. 4) Car CFWR 76718 was if [*sic*] fact one of the cars to be picked up.  5) Mr. Bevacqua did in fact pick-up cars at Ayer, WA, including CFWR 76718. 6) Car CFWR 76718 did not comply with the requirements of the stated rules but was picked up and placed in train anyway.  7) The car moved in a seriously defective condition from Ayer, WA. to Hinkle, OR. 8) The nature of the defect was obvious, and should have been easily detected if the Air Brake Test and Inspection were performed in compliance to the rules.  9) The car moved with no air brakes or even an operative hand brake.

It was the contention of the Organization [UTU] that if somebody else had done the proper reporting, then this car would not be scheduled to pick-up.  The fact that the car was not in proper status is exactly why these Rules are in effect. If we already knew every car we scheduled for pick-up was in proper working order, then we would not have to perform the Air Test and Inspection at all. . . .

Following the decision to assess Mr. Bevacqua a Level 4 offense for the September 21, 2004 incident, Mr. Bevacqua, in accordance with the Collective Bargaining Agreement, appealed the determination to the Public Law Board.  The Public Law Board is a three-person panel comprised of a representative from the UTU, a representative from Union Pacific, and a neutral arbitrator.  It is a Special Board of Adjustment created under, and governed by, the provisions of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*  (Bevacqua Dep. at 24:4-20; *see also* 45 U.S.C. § 151 *et seq.*)

On September 22, 2005, Mr. Bevacqua received notice from the UTU concerning his case before Public Law Board 6764, which was scheduled for hearing in October 2005.  (September 22, 2005, Correspondence). As part of this Notice, the UTU informed Mr. Bevacqua of the following:

You should understand that the Board's award will be final and binding on all parties, and the Board could decide not to interfere or disturb the discipline assessed by the Carrier. If for any reason you do not desire that your case be progressed to Public Law Board 6764, notify this office immediately in writing.

ORDER - 8

Public Law Board 6764 considered Mr. Bevacqua's claims against Union Pacific, including, among other things: (1) Mr. Bevacqua's contention that he conducted a proper air brake test and inspection; (2) Mr. Bevacqua's contention that he was improperly and/or incorrectly disciplined; (3) Mr. Bevacqua's demand for reinstatement to service; and (4) Mr. Bevacqua's claim for all time benefits lost from the time of his October 28, 2004, termination. (Public Law Board No. 6764 Findings and Opinion; Bevacqua Dep. at 56:8-14.) On January 31, 2006, the Public Law Board issued its Findings and Opinion:

> During the course of the formal hearing there was much discussion concerning bad order car CFWR-76718 and the handling given the disposition of the car by various Carrier Managers. Just briefly the car was set out at Ayer on July 31, 2004 after a train conductor with the assistance of a track inspector removed the defective brake rigging. This conductor filed the proper reports to his supervisor and the on duty train dispatcher. Nothing more occurred with the car until the crew on Train SKHK was instructed to pick it up on September 18, 2004. Fortunately the Track Inspector who had assisted in setting the car out was in the vicinity and advised the crew that he didn't think the car had been repaired. The car had not been repaired and the SKHK crew left it at Ayer. On September 20, 2004 the Claimant was instructed to pick up cars at Ayer which included the B/O car. His instruction did not contain any advice that the car might not be in condition to be moved. The Claimant complied with the instructions picking up the cars at Ayer starting the trip toward Hinkle. The Claimant states that he made a proper air test and inspection of the cars. *However, it is obvious that said inspections were not thorough as he did not see the missing brake beams nor that the brakes on the car would not set up. The cited rules were not fully complied with; therefore, some measure of discipline is warranted, however, permanent dismissal must be considered as excessive.*

(emphasis added.) Although Mr. Bevacqua claimed lost time benefits dating back to his October 28, 2004, termination, the Public Law Board's decision denied him such benefits prior to July 1, 2005 (the day Mr. Bevacqua was offered reinstatement by Union Pacific).

ORDER - 9

1      3.   <u>Present Action</u>

2     On September 26, 2005, while his claim was pending before the Public

3 Law Board, Mr. Bevacqua initiated the present action, seeking damages

4 against Union Pacific on the grounds that "as a result of [his] active

5 involvement in the union and zealous representation of union members, UP

6 Manager Clifton Mallett set [him] up for termination . . . ."

7 (Complaint.) Since being an employee of Union Pacific, Mr. Bevacqua has

8 also been a member of the UTU. (Complaint ¶ 2.2.) In 1993, Mr. Bevacqua

9 was elected to the position of UTU Local Chairman for Local 1505. He

10 served in that position between 1994 and 1998, completing a four year

11 term. *Id.* ¶¶ 2.4 & 2.5. In 1994 and 2003, Mr. Bevacqua held the elected

12 position of Delegate with the UTU. In addition, since 1998, Mr. Bevacqua

13 has served as a Legislative Representative for the UTU Local No. 1505

14 with his term set to expire in 2008. *Id.* ¶¶ 2.6 & 2.7. In 2003, Mr.

15 Bevacqua was elected to a second term as Local Chairman for UTU Local No.

16 1505. Mr. Bevacqua is currently serving as Local Chairman for the 2004

17 to 2008 term. *Id.* ¶¶ 2.8 & 2.9. Union Pacific has been aware of Mr.

18 Bevacqua's activities on behalf of fellow UTU members.

19                         **II. Standard of Review**

20     Summary judgment will be granted if the "pleadings, depositions,

21 answers to interrogatories, and admissions on file, together with the

22 affidavits, if any, show that there is no genuine issue as to any

23 material fact and that the moving party is entitled to judgment as a

24 matter of law." FED. R. CIV. P. 56(c). When considering a motion for

25 summary judgment, a court may not weigh the evidence nor assess

26 credibility; instead, "the evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id*. at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id*.  There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id*. at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law.  *Anderson*, 477 U.S. at 248.  This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

### III.  ANALYSIS

Union Pacific asks the Court to find as a matter of law:

> (1) the following factual findings of the Public Law Board 6764 are deemed established pursuant to the Railway Labor Act and/or collateral estoppel:
>> (a) Mr. Bevacqua violated Union Pacific rules by failing to conduct a proper air brake test and inspection of railcar CFWR 76718 and that the measure of discipline imposed was therefore warranted; and
>> (b) Mr. Bevacqua is not entitled to past wages between October 28, 2004, and July 1, 2005;
> (2) Mr. Bevacqua's claim for wrongful discharge on grounds that Union Pacific Manager Clifton Mallett set him up for termination cannot be sustained; and
> (3) Mr. Bevacqua's claim for unlawful discrimination cannot be sustained.

Plaintiff responds there is sufficient evidence presented to show that Mr. Mallett had the motivation and opportunity to set up Mr. Bevacqua for discipline and, therefore, Plaintiff survives summary judgment on the wrongful discharge and unlawful discrimination causes of action. Plaintiff also maintains that the findings of the PLB should not be given preclusive effect here. As explained below, the Court finds preclusive effect is to be given to the PLB's findings that Mr. Bevacqua violated Union Pacific rules and that some level of discipline was warranted, both under an election of remedies theory and the collateral estoppel doctrine. Once these facts are given preclusive effect, the Court finds Mr. Bevacqua did not present sufficient facts to demonstrate a genuine issue of material fact that Union Pacific's proffered justification for the discipline was pretextual.

**A. Findings of Public Law Board 6764**

    1.  <u>Railway Labor Act</u>

Union Pacific argues the Public Law Board's (PLB) factual findings are conclusive as to the parties pursuant to the federal Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq*. Plaintiff responds the PLB's factual findings should not be given preclusive effect pursuant to the RLA

ORDER - 12

because the RLA only has exclusive jurisdiction over "major" and "minor" disputes arising out of the parties' collective bargaining agreement (CBA) and Plaintiff's instant state law claims are not such disputes because they involve rights and obligations existing independent of the CBA.  In reply, Union Pacific clarifies it is not arguing that Mr. Bevacqua is preempted from proceeding in federal court due to the PLB proceeding, but rather that the PLB's factual findings are to be given preclusive effect in this proceeding because Mr. Bevacqua accepted the finality of the PLB's findings, i.e. Mr. Bevacqua elected a particular remedy.  The Court recognizes Mr. Bevacqua's instant claims are neither a "major" nor "minor" dispute under the RLA; however, the Court finds a limited discussion of RLA principles is necessary to explain the Court's reasoning for finding that the PLB's findings regarding a rule violation and discipline are to be given preclusive effect.

The RLA sets up a mandatory arbitral mechanism to promptly and orderly handle "major" and "minor" disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. §§ 153(I) & 151a; *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (finding state tort claim for wrongful termination in violation of public policy was not preempted because the claim was not covered by the CBA); *Kelley v. Norfolk & S. Ry. Co.*, 80 F. Supp. 2d 587 (S.D. W. Va. 1999). Therefore, the RLA does not preempt a cause of action if it involves rights and obligations that exist independent of the CBA and can be resolved without interpreting the CBA itself.  *Hawaiian Airlines, Inc.*, 512 U.S. 246, 266 (1994); *Kulavic v. Chicago & Ill. Midland Ry. Co.*, 1

F.3d 507, 514-15 (7th Cir. 1993); *Kelley*, 80 F. Supp. 2d at 593; *see also Loewen Group Int'l, Inc. v. Haberichter*, 65 F.3d 1417 (7th Cir. 1995); *Monroe v. Mo. Pac R.R. Co.*, 115 F.3d 514, 517 (7th Cir. 1997); *Pulcino v. Fed. Express Corp.*, 141 Wash. 2d 629, 647 (2000), *overruled in part on other grounds by McClarty v. Totem Elec.*, 157 Wash. 2d 214 (2006).

If a major or minor dispute remains unsettled, a party may submit it to a PLB. 45 U.S.C. § 153(m) & Second.  The PLB's decision is final and binding upon both parties to the dispute. 45 U.S.C. § 153(q).  Yet, a party may appeal a PLB decision and seek judicial review on the following three grounds: (1) the PLB failed to comply with the requirements of the RLA, (2) the PLB failed to conform, or confine, itself to matters within the scope of its jurisdiction and to submitted matters, and (3) fraud or corruption.  *Id.; Union Pac. Ry. Co. v. Sheehan*, 439 U.S. 89, 93 (1978); *Kulavic*, 1 F.3d at 513; *Farris v. Alaska Airlines, Inc.*, 113 F. Supp. 907, 909 (W.D. Wash. 1953).

Mr. Bevacqua did not appeal the PLB's decision.  Therefore, pursuant to 45 U.S.C. § 153(q) the "findings and order of the [PLB] shall be conclusive as to the parties" and control in this lawsuit.  Accordingly, Mr. Bevacqua elected the remedies available during the PLB process, namely reinstatement, as is reflected by the Supreme Court's statement in *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 324 (1972), "[a] party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding" because they have elected a particular remedy.  *Id.* at 325. Therefore, even though Mr. Bevacqua may bring the instant lawsuit claiming state law claims based upon statutory rights, within this

lawsuit the Court concludes the following PLB factual findings are to be given preclusive effect: (1) Mr. Bevacqua failed to perform a thorough and proper air test and inspection of Railcar CFWR 76718 and (2) because Mr. Bevacqua failed to perform a thorough and proper air test and inspection as required by Union Pacific rules some measure of discipline was warranted.[5]   This ruling recognizes that the "effectiveness of the [PLB] in fulfilling its task [to secure the prompt, orderly, and final settlement of grievances] depends on the finality of its determinations." *Union Pac. Ry. Co. v. Sheehan*, 439 U.S. 89 94 (1978).

    2.  <u>Collateral Estoppel</u>

    The Court also finds these two PLB findings are to be given preclusive effect based on the doctrine of collateral estoppel. Collateral estoppel, also called issue preclusion, bars relitigation of an issue in a subsequent proceeding involving the same parties.

---

    [5] Although the Court concludes the PLB's lost wages determination is not to be given preclusive effect in this lawsuit, that is immaterial because the Court ultimately grants Defendants' Motion for Summary Judgment.  The PLB did not explain why it selected the date of July 1 2005, as the starting point for Mr. Bevacqua's lost wage claim.  Because the issue of whether Mr. Bevacqua was "set up" for this second Level 4 violation was not before the PLB and thus the economic damages determination was likely not based on the same issues that are involved with Plaintiff's state law claims, the Court finds the PLB's lost wages determination is not to be given preclusive effect here.  *See Kulavic v. Chicago & Ill. Midland Ry. Co.*, 1 F.3d 507, 511, 17 (7th Cir. 1993).

*Christensen v. Grant County Hosp.*, 152 Wash. 2d 299, 306 (2004).    It

serves to bar a second litigation on issues between the parties, even

though a different claim or cause of action is asserted, thereby

promoting judicial economy, serving to prevent inconvenience or

harassment of parties, and providing finality in adjudication.    *Id.* at

306-07.    For collateral estoppel to apply, the party seeking the

application of the doctrine must establish:

> (1) the issue decided in the earlier proceeding was identical
> to the issue presented in the later proceeding, (2) the earlier
> proceeding ended in a judgment on the merits, (3) the party
> against whom collateral estoppel is asserted was a party to,
> or in privity with a party to, the earlier proceeding, and (4)
> the application of collateral estoppel does not work an
> injustice on the party against whom it is applied.

*Id.* at 307; *see also Reninger v. Dep't of Corrs.*, 134 Wash. 2d 437, 449

(1998); *Giles v. City of New York*, 41 F. Supp. 2d 308, 313 (S.D.N.Y.

1999).    The last factor, the injustice factor, requires that the party

against whom collateral estoppel is being asserted have had a full and

fair opportunity to litigate the issue in the first forum; plus, the

court should consider whether the disparity of relief is so great that

the party was unlikely to have vigorously litigated the issues in the

first forum.    *Christensen*, 152 Wash. 2d at 309.

       When considering whether an administrative tribunal's determination

should be given preclusive effect, the court is also to consider: (1)

whether the agency acted within its competence when making the factual

decision, (2) the differences between the administrative and court

procedures, and (3) public policy considerations.    *Christensen*, 152 Wash.

2d at 308; *Reninger*, 134 Wash. 2d at 449-50; *see Astoria Fed. Sav. & Loan

Ass'n v. Solimino*, 501 U.S. 104, 107-08 (1991).    The application of

ORDER - 16

1  collateral estoppel from arbitral findings is a matter within the broad
2  discretion of the district court. *Universal Am. Barge Corp. v. J-Chem,*
3  *Inc.*, 946 F.2d 1131, 1137 (5th Cir. 1991).

4      Although all of the issues before this Court are not the same as
5  those before the PLB, the PLB did have before it the questions of whether
6  Mr. Bevacqua conducted the appropriate air and brake tests consistent
7  with Union Pacific rules and whether discipline was warranted.  There is
8  no question that Mr. Bevacqua was a party to the PLB decision and that
9  the PLB decision is final.   Therefore, the key question is whether
10 applying collateral estoppel will work an injustice to Mr. Bevacqua – the
11 fourth element.

12      Mr. Bevacqua conceded the PLB was acting within its competence when
13 it made its factual findings.  Yet, as emphasized by Mr. Bevacqua, there
14 are differences in the PLB proceeding as compared to the discovery and
15 trial process that occur in this Court.  During the PLB process, Mr.
16 Bevacqua did not have the right to legal counsel or to conduct his own
17 investigation and there were no formal rules of procedure or evidence
18 that governed the hearing.  Notwithstanding these differences, the Court
19 finds fundamental fairness was not lacking during the PLB process because
20 his Union, and therefore Mr. Bevacqua, agreed to these procedures as part
21 of the CBA and, more importantly, because he elected to participate in
22 the PLB process to seek reinstatement.  As reinstatement was an important
23 remedy to Mr. Bevacqua, he had an interest in ensuring that the PLB made
24 an informed decision.  Mr. Bevacqua had a full and fair opportunity to
25 litigate whether he violated Union Pacific rules and whether termination
26 was an appropriate sanction.  The Court also finds the public policy of

supporting the finality of PLB decisions, thereby ensuring that the parties to the CBA have access to an effective and efficient dispute resolution procedure, weighs in favor of finding that applying collateral estoppel on these two issues does not work an injustice on Mr. Bevacqua. After weighing all of these considerations, the Court concludes applying collateral estoppel on the issues of whether Mr. Bevacqua violated Union Pacific rules and what level of discipline was justified are to be given preclusive effect.[6]

**B.    Wrongful Discharge In Violation of Public Policy**

Union Pacific argues the undisputed evidence shows that it would have reached the same decision as to discipline regardless of Mr. Bevacqua's membership in the Union and his concerted activities on behalf of his fellow members and, therefore, Mr. Bevacqua's claim for wrongful discharge in violation of public policy fails. Plaintiff responds that he has presented sufficient evidence to "create questions of material fact that UP management conspired and successfully set up Mr. Bevacqua for discipline and termination in order to create a chilling effect and discourage aggressive union representation." (Ct. Rec. 22-1 at 20.)

Washington allows an employee to bring a wrongful discharge claim on public policy grounds. *Thompson v. St. Regis Paper Co.*, 102 Wash. 2d 219 (1984). In *Gardner v. Loomis Armor, Inc.*, the Washington Supreme

---

[6]    Similar to above, the Court finds Mr. Bevacqua is not collaterally estopped from litigating the period of time for which he is entitled to lost wages given that the damages issues before the PLB and this Court are different. *See Kulavic*, 1 F.3d 517-20.

ORDER - 18

Court established that in order to successfully bring a wrongful discharge claim on the basis of public policy grounds, plaintiff must prove (1) the existence of a clear public policy, (2) that discouraging the conduct in which he engaged would jeopardize the public policy, (3) the public-policy-linked conduct caused the dismissal, and (4) that the employer's justification for the termination was pretextual.  128 Wash. 2d 931, 941 (1996); *Ellis v. City of Seattle*, 142 Wash. 2d 450, 459 (2000); *Kahn v. Salerno*, 90 Wash. App. 110, 129-31 (1998).

For purposes of analyzing Union Pacific's motion, the Court presumes Mr. Bevacqua satisfied the first three elements.  The Court finds the critical question, once preclusive effect is given to the PLB's rule violation and disciplinary findings, is whether Plaintiff presented sufficient evidence to establish a genuine issue of material fact as to the fourth element - pretext.  Because Mr. Bevacqua had a second Level 4 violation in a span of twenty-four months, discipline and termination were allowed under Union Pacific policies.  Even though Mr. Mallett failed to carry out what was conceded at oral argument to be his duty to manage the men and railcars under his supervision with regard to their safety and the safety of the public by failing to warn Mr. Bevacqua about the bad order status of the railcar - a courtesy shown by Mr. Rosgen on several occasions -, this does not affect Mr. Bevacqua's separate and independent duty to perform his responsibilities and neither does it correlate to a finding that Mr. Bevacqua presented sufficient evidence of pretext.  Upon a balanced review of the record, without regard to the Court's perception of disparate discipline,[7] the Court finds insufficient

---

[7]  Such disparate discipline will only add another anecdote to the

ORDER - 19

evidence at this stage to establish that Mr. Mallett and Mr. Harrison colluded with each other to set Mr. Bevacqua up for his second Level 4 violation due to Mr. Bevacqua's union activities.  There is much evidence that Mr. Mallett cursed and yelled at individuals he was supervising (Ct. Rec. 23-1: Plaintiff's Statement of Facts pp. 3-12); however, there is no indication that Mr. Mallett's alleged collusion was connected to Mr. Bevacqua's Union activities, especially since the claimed "Union harassment" by Mr. Mallett occurred in 2003.  Mr. Bevacqua is unable to show a close temporal nexus between any Union activity and this claimed collusion.  For these reasons, the Court finds Mr. Bevacqua presented insufficient evidence to establish a genuine issue of material fact that Union Pacific's justification for its discipline is pretextual.  The Court notes, although Mr. Bevacqua had an independent duty to perform the required tests, that the PLB that reinstated him which was certainly appropriate given that this "bad ordered" railcar was only on Mr. Bevacqua's work order due to a series of failures in the system and due to Mr. Mallett's failure to relay the known status of this railcar to Mr. Bevacqua.

**C.   Unlawful Discrimination**

        Lastly, Union Pacific argues Mr. Bevacqua failed to demonstrate that Union Pacific discriminated against him by creating an abusive or hostile work environment in violation of RCW 49.32.020; further, Defendant argues there is no claimed harm.  Mr. Bevacqua's response to this issue is largely identical to his response to the above issue.

---

already contentious, often acrimonious, labor relations.

ORDER - 20

To establish a claim for unlawful discrimination because of his Union-related activities, Mr. Bevacqua must establish: (1) discrimination in tenure of employment, or any other term or condition of employment; (2) resulting discouragement of union membership; and (3) unlawful intent. *Elec. Fittings Corp.*, 216 N.L.R.B. 1076 (1975). The term discrimination in this context refers to disparate treatment towards employees solely on the basis of their union membership or activities, and without reference to whether the jobs they hold are comparable. *Montgomery Ward & Co. v. NLRB*, 107 F.2d 555, 564 (7th Cir. 1939); *Local 357, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Nat'l Labor Relations Bd.*, 365 U.S. 667 (1961).

First, the Court disagrees with Union Pacific's argument that Mr. Bevacqua has no claimed harm separate and apart from the issues raised in the PLB proceeding. Through this lawsuit, Mr. Bevacqua can seek emotional distress and other damages not available to him during the PLB proceeding. However, for the reasons indicated above in connection with Mr. Bevacqua's wrongful termination claim, the Court finds Mr. Bevacqua failed to present sufficient facts to establish a genuine issue of material fact as to whether he was discriminated against due to his union activities. Although Mr. Bevacqua presented evidence that Mr. Mallett was aware of his Union activities and that Mr. Mallett was often rude and abrasive when it came to dealing with Union matters, there is no evidence that Mr. Mallett treated Mr. Bevacqua differently than other employees, or more importantly that the October 2004 incident was a result of Mr. Bevacqua's Union activities. Also, the fact that both Mr. Mallett and Mr. Harrison held leadership positions in the Union prior to holding

their current management positions, weighs against Mr. Bevacqua's personal belief that he was discriminated against due to his Union involvement.  Therefore, the Court grants Union Pacific's motion in this regard.

**D.    Conclusion**

As explained above, preclusive effect is given to the PLB's findings related to the violation of Union Pacific rules and the level of discipline warranted.  As a result, given that Union Pacific had a legitimate business reason to terminate Mr. Bevacqua, the Court finds Plaintiff failed to present sufficient evidence to survive summary judgment on his wrongful discharge in violation of public policy and unlawful discrimination causes of action.  Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendants' Motion for Summary Judgment **(Ct. Rec. 18)** is **GRANTED.**

2.    **Judgment** is to be entered in Defendant's favor with prejudice.

3.    This file shall be **CLOSED,** and all pending motions **DENIED AS MOOT.**

**IT IS SO ORDERED**.  The District Court Executive is directed to enter this Order and provide a copy of the Order and Judgment to counsel.

**DATED** this ___17th___ day of October 2006.


           ____S/ Edward F. Shea_____
                  EDWARD F. SHEA
           UNITED STATES DISTRICT JUDGE


Q:\Civil\2005\0321.MSJ.wpd


ORDER - 22